Thank you. You may be seated. Good afternoon. We are ready for our first case of the afternoon, which is case number 416-0414, Moore v. Department of Human Services. For the appellant, we have Mr. Young. And for the appellee, we have Mr. Elitz. You may proceed, counsel. I please the court, Mr. Elitz. We are here on an appeal of an administrative review, and at the outset I want to address the issue of the standard of review. There is a substantial disagreement as to whether or not which standard would apply, and we submit that there is simply an issue of law so that the de novo standard of review should apply here. There was no dispute as to any facts. There was nothing adjudicated about facts below. At rock bottom, this case is simply about whether or not the product purchased by Mrs. Moore on the market was for fair market value, which I think is acknowledged that it should be. And the law simply is very clear that it is. The question perhaps then becomes whether or not the agency can look behind that and to determine basically whether or not the product that she did purchase at arm's length, which by the way is by definition for fair market value, whether they can inquire into that. Whether the agency or the court is entitled to enter into the fray of whether or not the allocation of resources is to be done by the agency or the executive or the judiciary, that is strictly a legislative function, as the Gilmore case has very plainly said. So this case, when she bought the insurance product that she bought, which had been approved by the Department of Insurance, at arm's length, was available to anybody and everybody, that should have concluded this case. The regulation which we've cited in the policy manual at 020720B simply says, fair market value, transfers for fair market value are allowable, period. That should have ended this case, and that I think requires that this course remand and send it back to do away with the penalties at which it was imposed. What does that phrase mean, transfers for fair market value? I'm sorry? What does it mean, transfers for fair market value? Is that purchasing something? Yeah, at arm's length. It's available to anybody and everybody in the marketplace. It is by definition a fair market value purchase. So if the deceased had purchased something, or if the, before she died, this is Hilda Buckley, is that her name? Correct. If she had purchased something for fair market value, purchased the widget for $15,000, she's got the widget, and that's a legitimate purchase? Certainly. What she would do with the widget, I guess, is another question, but, and I suppose under those circumstances, the widget might have been available for, you know, it would be a countable asset. It's something also that arguably, if she purchased, it would be to benefit her, but how in any way did she benefit from the purchase of this life insurance? She acquired the life insurance protection that the policy afforded for her daughter in this instance, which is perfectly legitimate. She acquired, that's what life insurance is. You purchase protection for one or more persons. And by definition, you know, you're out the money and somebody else has now assumed, you know, some risks. And in this case, the acquisition of that protection was not illegal. Well, it was $15,000 in this case, wasn't it? That's correct. What if she had $100,000, that's her only asset, and she used that to buy life insurance? Would that make any difference? I don't think the amount makes any difference. Well, how is it not then essentially dissipation of her assets to make her eligible for state subsidies, which is what this statute is designed to not permit? I disagree. The question is whether or not she, sheltering of assets is perfectly permissible. It's akin to the old, whether it's avoidance or evasion issues like in life insurance. So long as she's not abusively sheltering, that's the test that's applied. Sheltering of assets is perfectly permissible, and as we state in the ethical opinion from the Pennsylvania Bar Association and especially this honor case out of the third district, you know, planning is endemic to Medicaid, Medicare, college planning, all of those kinds of things. So the question simply comes down to whether or not she engaged in some illegal or abusive transfer of assets. Well, isn't there a look-back period? Pardon me? I mean, there's a look-back period. Yes. So if she had done this, you know, I don't know what the time frame is anymore. Five years. If she had done this purchase five years ago, it wouldn't have been a question, but it was done within that five-year period, right? It wouldn't have even been asked about. Right. So within the five-year period, the question immediately becomes, did she receive fair market value for what she acquired with her assets? What did she receive? The life insurance policy she purchased. Which benefits who? Her. How does that benefit her? She bought the protection for her family. That's what life insurance is. There is no subjective test that you can go to beyond to say, well, you know, somehow or another, you know, as the Zahner case said, adding a sniff taste to the whole situation. Whether her motives were to – are irrelevant, what the department thought about the product is irrelevant. The question simply is whether or not she acquired an asset on the market at arm's length for fair market value. That should end the whole inquiry. To look behind it is to add a subjectivity test to the whole idea, and, you know, that's not right or legal. There is only one subjective test that's allowed under Medicaid, and that is if you've made a transfer within the look-back period, and it was plainly not made for purposes of qualifying for Medicaid, then the court can allow the Medicaid. And the old example is the man who gave his business to his son, retired and went to Florida, had a stroke, came back, and they said, well, obviously he didn't make that transfer for purposes of qualifying for Medicaid, and therefore he did qualify for it. That's the only subjective test allowed under the rules and regulations under federal law. It's expected that people would do planning, unlike any other situation. You plan for your children's college, and putting money aside for that, you know, is not... Well, none of that is any of the government's business, and no one cares unless you're going to say, oh, now I need a government subsidy. Doesn't that make all the difference? No. No, the question is did you obey the regulations? Did you shelter assets legally, or did you abusively shelter them? And in this case, she bought a product available to anybody on the market and received fair market value by operation of law, by definition. The Supreme Court decided many, many years ago, the U.S. Supreme Court in the Guggenheim case. What about the Illinois Supreme Court's analysis in the Gilmore case? I realize there was an annuity in that case, but does that inform our decision here? The Gilmore case at the end plainly says the courts and the agency should stay out of the fray. That's a legislative function, and we submit respectfully that the Gilmore case does not apply here because it does... But the real test is whether they were abusively sheltered or not. So when the Gilmore case talks about the fact that the balloon payment under the annuity would extend beyond the purchaser's life expectancy, which meant that it did not qualify as a purchase for fair market value, that has no bearing on the decision we have to make here? Well, I think, you know, you're bound by Supreme Court decisions, and if you say an annuity case is analogous here, I can certainly understand that. But in that situation, that was decided pre-DRA, or the Deficit Reduction Act of 2005, which this is a bit afoot of the field, but that was decided pre-DRA, and then when the DRA was passed, the Congress did outlaw those kinds of annuities, which we submit says that because they did outlaw them, they were allowable before. But we do acknowledge that the Gilmore case does talk about the sheltering of assets, but clearly, as in this case, and I think this is much plainer, because the annuity was for the benefit of, or for the immediate benefit, and was payable to the purchaser of the annuity, where here the policy is purchased for the benefit to buy protection for family members, to some extent. To be paid after her death, so that's definitely even more than beyond life expectancy, as we had with the annuity in Gilmore. Well, actual death doesn't really count. I mean, these things are always decided on life expectancy based on the tables. I mean, we decide death on a wholesale basis and not on a retail basis in that instance. To do otherwise is to inject a subjective test to question the purpose or intent of the purchase, and there is no provision under the law for the agency, or even the courts, to go beyond the purchase of this product for clear fair market value, which was done in this case. As we indicated, you know, planning is appropriate. It may even be malpractice for a counselor or an advisor to this woman not to advise that she do that, to get the protection for her own daughter. There's no legal excuse to look behind the reason for this transaction or second guess the purpose or the intent of the applicant in this case. We submit that the Zahner case, I think, finally lays out at great length and with great clarity the way the court should view Medicaid applications. The third district made it very plain that planning is endemic in the Medicaid process. It's okay, and unless there is an abusive sheltering of assets, the court cannot apply an unreviewable SNF test just because, you know, resources may be reallocated. How old was Zelda Buckley when this life insurance was purchased? I don't recall. She was reaching the need for a shelter, for assisted living. Was she frail? Right. I'm sorry? She was elderly and frail would be a good sense. She may have been, but again, these things are decided not on a retail basis. The actual health of an applicant does not matter. The courts are to look to the tables, table B, published by the United States Census Department on what life expectancy is, and if she meets those qualifications. So here's my question. Let's assume she's 80 years old and she's in bad health and she needs to, she needs nursing home care. If I understand your position correctly, and correct me if I'm wrong, she could liquidate all her assets, quarter million dollars worth, and, you know, there's a market for everything. There's not much of a market for life insurance if you're old, but I suspect there's some insurance company that if you give them $250,000 to purchase a life insurance policy, they will sell you a policy that will pay you $260,000, and that's to protect my family, you say. And she does that, and that's beyond the purview of the state to inquire into, was this an improper transfer of assets to avoid, or to make her then susceptible to subsidize? Implied in that is that she went and negotiated with the insurance company one-on-one. I don't think that may be suspect, but where you buy a product that's available to the public. Well, the life insurance policies are available. Here's the life insurance company, Aetna Insurance, they sell life insurance, and she says I want to buy it. They said, well, we don't normally sell to people 80, and she says, well, what's the market? And how about $260,000 worth of insurance, I'll pay you $250,000 in cash. I suspect they'd do it. If it was a product approved by the Department of Insurance, it would be perfectly permissible for her to do so, yes. Doesn't that seem to be contrary to what the legislature has intended here? If it is, it's for the legislature to correct it, not for the agency to just make up their own rules and look behind the fair market value transaction and to apply their own subjective test and say, we don't like this product, and therefore we're going to do this. Just as Holder-Wright asked, though, wouldn't that same criticism apply to what the Supreme Court did in Gilmore, and yet they did it? I understand that. Gilmore was pre-DRA. But I'm not sure, again, this is not an area of my expertise, so I apologize. I ask you to educate me. But what does that mean, and how does that matter? Are you saying Gilmore is no longer good law? And if so, why? I would say this. There was a recent case decided by this court, which there's a PLA pending right now, and it's on that very issue. So we're asking the Supreme Court to actually review Gilmore and to reach the conclusion that they intended at the end that this is a legislative and not a judicial or executive decision. Of course, we don't know what the PLA is, but to answer my question, why does the DRA matter, and why is Gilmore not subject to the same criticism you're saying is subject to the question I raised? Because as Justice Holder White recognized, Gilmore was decided pre-DRA. It dealt with annuities. This deals with insurance products. The annuities in that case were designed to be purchased on the life expectancy of the annuitant. The question there was whether you could push all those payments towards the end of your life expectancy. It was actually after the life expectancy, correct, in Gilmore? Even after, right. So do we have to reject Gilmore to decide the way you want us to decide? I don't think so. I mean, Gilmore dealt with annuities. This deals with insurance products readily available on the market. The annuities in Gilmore were negotiated based on, you know, what was available and life expectancy in reference to tables and those kinds of things. So I don't think you run afoul of Gilmore by deciding this case in favor of Mrs. Buckley here based strictly on the department's own rules which say acquisitions for fair market value are allowable, period. We submit that that makes the purchase bulletproof. The inquiry should have stopped there. And to look behind that and to look at motives or intent or departmental dissatisfaction with the product is irrelevant. And for those reasons, we ask that you would reverse. Thank you, Mr. Young. You'll have time on rebuttal if you wish. Thank you. You may proceed, counsel. Good afternoon. May it please the Court. I'm Assistant Attorney General Carl Ilitz for two agencies, the Department of Human Services and the Department of Health Care and Family Services. These agencies issue decisions jointly. I'm sure you realize that. Our position is that the facts of this case are controlled by Gilmore. I've also cited a case from this district, Jayden, and another case from this district, McDonald, I think also go to the same point, which is that if you don't actually receive the fair market value or the benefit of the transaction, then it's not something that can be allowable and is used for purposes of determining a period of ineligibility for the calculation. There's been no suggestion that this transfer is illegal or improper or faulty. There's nothing wrong with it. It's just that if you make an application for state-subsidized medical care and you have one of these transactions, you incur a penalty period. She's entitled to buy this product. She can buy it. She can make provisions for it. It's just going to affect the state's obligation to pay for her health care coverage. I cited in my brief a provision of the Regulations 120.388F, which talks about what the definition of fair market value is for purposes of determining eligibility. The provision makes clear that transfers for love and affection are not something that is counted towards being a fair market value transaction. That doesn't mean that the Department of Insurance would offer a letter and say, yeah, this looks like a fair market value transaction to us. But with regard to the department determining eligibility, there's a specific regulation on this point, and they have not, as the Circuit Court pointed out, challenged that regulation. They've not challenged any of the regulations, including that provision. What does this fair market value transaction mean? It seems to be a strange kind of term. Well, I have an economics degree a long time ago, and we used to say a willing buyer would pay for – with a willing seller agree would be a fair price and would do a transaction. What about the hypothetical I gave to Mr. Young that's a willing buyer and a willing seller for $250,000 worth of insurance? It could be a million. It could be $100 million. Well, then why – but his point seems to be a good one. You know, then that should be the beginning and end, if it's a willing buyer and a willing seller, this free market transaction. But apparently your position is, no, that's not the beginning and the end. It's got to be something that will benefit the purchaser or, more specifically, not a situation where she can dissipate her assets so as to be eligible for state subsidies and the dissipation is for her family or whomever. Your position is you can't do that. Our position is you can't do it. He calls this a bulletproof transaction. Apparently it does away with all the need for even an analysis under the rules as to whether fair market value has been received because as long as he can establish that the market would allow this transaction between some other 80-year-old or 90-year-old person and an insurance company, then it would be fine. But the point I want to emphasize is not just the public policy that makes this a bad result and it's a terrible result. I think it just scraps any sort of periods of ineligibility for people. They would just wrap up their estates into life insurance policies or annuities and do one of these transactions, and then their eligibility would be immediate. And it doesn't really matter that a moment before they made their application, they had plenty of money or some money to apply towards their own health care. Let me ask you this. This is one of those situations that kind of mystify me. The situation regarding Alda Buckley and her family is one which you would think, I would think, comes up not infrequently. What are we going to do and how are we going to do this and all the rest of it? And I would think one way to look at this is, well, maybe we can shelter assets, essentially, by buying life insurance, as happened here. How is it that we're the first court to get this issue? Oh, I don't think you are, Your Honor. I think this is just a different vehicle among many that I have litigated against. Well, the Gilmore case, for instance, was annuities. There's some other case directly dealing with the person's insurance. Jayden was cash benefits, I think, cash that was given to family members over a period of months before the annuity. Well, but I'm talking about life insurance specifically. You heard the argument with Mr. Young. This is a purchase of life insurance, and by God, it's okay. I just think that's an argument that Mr. Young is making, but it's without the support. Well, how is it that we're the first court to address the purchase of life insurance in this context? Is there some other? I have not gone outside Illinois in my research, because I didn't think it was that important to see. Well, it probably wouldn't be. I suspect if I were to go beyond Illinois, we might find cases involving life insurance, and for that reason, I think the answer to your question might be it's not the first case. I don't know of another case involving life insurance. Well, this is the first case you know of in Illinois? It is, but I'm dealing with a few cases that I've cited that seem to be on point. I haven't gone to see if there's unpublished decisions that might lead to decisions of the department or whatnot. But I don't know that it matters. And Mr. Young is saying he can distinguish Gilmore on this basis, but I wish he had said that before we got to this podium, because he didn't file a reply brief distinguishing Gilmore in that way, and the circuit court's decision is based on Gilmore. If Gilmore was distinguishable, it seems late in the game to argue that the Deficit Reduction Act or the differences between annuities and life insurance policy mean that Gilmore doesn't apply. My argument is that Gilmore applies. He's not raised any argument with this court distinguishing Gilmore, and the court should simply cite Gilmore, and we should move on. If there's a PLA in the Supreme Court now to tease out this issue, we might get a decision from that court that might come up with a different result. But as far as this court's concerned, I don't see any citations to the Deficit Reduction Act or to an argument that annuities are different than life insurance policies. I don't even think Gilmore is cited in this brief, and yet it was the basis of the circuit court's decision. The trial court said in certain order that the transfer of this case provides even less fair market value to the plaintiff than did the annuity in the Gilmore case. Is that correct? I think it is correct. And I want to emphasize, it's not my – I'm not disagreeing with the definitions of fair market value. My point is that Ms. Buckley didn't receive that value, that in this particular transaction, this life insurance transaction, it's structured such that the benefit of the fair market value is received by her daughter or her sister if her daughter is unavailable to take the benefit. And that is, in my view, a violation of the regs, and it's not a subjective test at all. It's a question of have you met the regs? How is it that Ms. Buckley has received the benefit of this $15,000? If she had bought a widget and the widget was part of her estate when she died, the widget would be used as an asset in calculating what her possible medical benefits would be. And their argument is, well, if we don't buy a widget, if we buy an insurance policy instead, you can't use the benefit of that policy or the value of that policy, rather, to calculate out what her medical benefits are. So, again, I want to emphasize, we're not arguing that this is an illegal transaction, an improper transaction, an immoral transaction. We're just saying that if you do one of these transactions before you make an application for medical benefits, we're not going to pay the medical benefits out until a period of disallowance has passed. And in this case, it was just two months. The trial court cited a Florida District Court of Appeal decision, unpublished, but it seems to be on point here, and that's the only thing, apparently, Judge Otwell could find, I guess. I noticed that, but I have to say I didn't notice it until this morning. When I was preparing the briefs, I probably looked at it and thought, does this court care about an unpublished Florida decision? Probably not. Oh, we care about everything. So maybe to wrap up, again, it's not the definition of fair market value I'm emphasizing. It's who has received the value of that fair market value transaction that dooms Ms. Buckley's application, or at least it doesn't doom it. She's still entitled to Medicaid benefits, but she does have a waiting period of two months. We think Gilmore is directly on point. We don't think it's been properly distinguished before this court. I don't think it can be properly distinguished even if it had been briefed, but that's neither here nor there. So I would urge the court to rely on Gilmore. Oh, standard of review. I would urge the court to apply the same standard of review as it applied in Jayden, which is in a case just like this one out of this district, and that was the clearly erroneous standard. Applying the facts, applying the law, rather, that we agree on, what the regs are, the facts that are established by the record. This court is left with a definite and firm conviction that a mistake has been committed. That would be that standard of review. Unless there are questions. I don't see any. Thank you, counsel. Thank you very much, Your Honor. Any rebuttal, Mr. Young? Very briefly. Are we seriously saying that when I buy life insurance to protect my children, that because I die in order for that protection to be afforded to them, that I have received no benefit from that? That's what life insurance is. She bought an integrated policy for the protection of her child, and to suggest that it was just done out of love and affection, I think, distorts the law. The Supreme Court of the United States has long ago held that the value of the life insurance protection you purchase is what you pay for it. Therefore, it has to be fair market value. To somehow suggest that Mrs. Buckley didn't get any benefit, I think, is a distortion of logic and the true facts because she bought protection for her own daughter. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess until the next case.